# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## RI-2 NEWCO, LLC

**Effective Date: [•], 2022**

THE UNITS REPRESENTING MEMBERSHIP INTERESTS (THE "UNITS") OF RI-2 NEWCO, LLC (THE "COMPANY") HAVE NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), THE SECURITIES LAWS OF ANY U.S. STATE OR ANY OTHER APPLICABLE SECURITIES LAWS IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS. SUCH UNITS MUST BE ACQUIRED FOR INVESTMENT ONLY AND MAY NOT BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD, ASSIGNED, OR TRANSFERRED AT ANY TIME EXCEPT IN COMPLIANCE WITH (I) THE SECURITIES ACT, ANY APPLICABLE SECURITIES LAWS OF ANY U.S. STATE, AND ANY OTHER APPLICABLE SECURITIES LAWS; AND (II) THE TERMS AND CONDITIONS OF THIS LIMITED LIABILITY COMPANY AGREEMENT. THE UNITS MAY NOT BE TRANSFERRED OF RECORD EXCEPT IN COMPLIANCE WITH SUCH LAWS AND THIS LIMITED LIABILITY COMPANY AGREEMENT. THEREFORE, HOLDERS OF THE UNITS SHALL BE REQUIRED TO BEAR THE RISK OF THEIR INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

# LIMITED LIABILITY COMPANY AGREEMENT
## OF
## RI-2 NEWCO, LLC

THIS LIMITED LIABILITY COMPANY AGREEMENT (this "Agreement") of RI-2 NewCo, LLC, a Delaware limited liability company (the "Company"), by and among: (i) the Members executing this Agreement as of the Effective Date (as such term is defined below); and (ii) each other Person who, after the Effective Date, becomes a Member of the Company and agrees to be bound by the terms of this Agreement.

## W I T N E S S E T H:

WHEREAS, on March 4, 2021, R. Investments, RLLP, commenced a voluntary petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Colorado (the "Bankruptcy Court"), styled as *In re R. Investments, RLLP*, Case No. 21-21011-EEB (the "Bankruptcy Case");

WHEREAS, on [•], 2022, the Bankruptcy Court confirmed R. Investment, RLLP's *Third Amended Chapter 11 Plan of Reorganization Dated August 16, 2021* (the "Plan");

WHEREAS, on [•], 2022 (the "Effective Date"), the Plan went effective by its terms thereby making this Agreement effective as to the Company, Manager, and Members;

WHEREAS, the Company was formed, in furtherance of the Plan confirmed by the Bankruptcy Court and under the laws of the State of Delaware by the filing of a Certificate of Formation (the "Certificate", which term shall include all amendments thereto) with the Secretary of State of the State of Delaware on [•], 2022, pursuant to the provisions of the Delaware Limited Liability Company Act, as amended (the "Act");

WHEREAS, the Manager and the Members are parties to this Agreement, as required by the confirmed Plan, in order to set forth the terms and conditions pursuant to which the Company shall be operated under the Plan and to set forth the rights, duties, and obligations of the Manager and Members to the Company;

WHEREAS, for the avoidance of doubt, if there is any inconsistency between this Agreement and the Plan, the Plan shall control in all circumstances.

NOW, THEREFORE, IN CONSIDERATION OF THE MUTUAL PROMISES, COVENANTS, AND UNDERTAKINGS HEREIN SPECIFIED, AND FOR OTHER GOOD AND VALUABLE CONSIDERATION, THE RECEIPT OF WHICH IS HEREBY ACKNOWLEDGED, THE PARTIES, INTENDING TO BE LEGALLY BOUND, HEREBY AGREE AS FOLLOWS:

# ARTICLE 1
## DEFINITIONS AND REFERENCES

1.1.    <u>Definitions</u>. Except as otherwise provided for in this Agreement, the terms defined in <u>Exhibit A</u> shall, for purposes of this Agreement, have the meanings therein specified.

1.2.    <u>References</u>. Unless the context otherwise requires, references herein: (a) to Articles, Sections, Exhibits, and Schedules mean the Articles and Sections of, and the Exhibits and Schedules attached to, this Agreement; (b) to an agreement, instrument, or other document means such agreement, instrument, or other document as amended, supplemented, and modified from time to time to the extent permitted by the provisions thereof; and (c) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder.

# ARTICLE 2
## FORMATION OF COMPANY

2.1.    <u>Formation</u>. The Company was organized, as required under the terms of the Plan, as a Delaware limited liability company on [•], 2022, under and pursuant to the Act.

2.2.    <u>Name</u>. The name of the Company is "RI-2 NewCo, LLC", and the business of the Company shall be conducted under that name.

2.3.    <u>Principal Place of Business</u>. The Company's principal place of business shall be 1624 Market Street, Suite 226 #24937, Denver, CO 80202, or such other location as the Manager may determine from time to time.

2.4.    <u>Registered Office and Registered Agent</u>. The registered office of the Company shall be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Manager may designate from time to time in the manner provided by the Act. The registered agent for service of process on the Company in the State of Delaware shall be the initial registered agent named in the Certificate or such other Person as the Manager may designate from time to time in the manner provided by the Act.

2.5.    <u>Records and Reports</u>. At the expense of the Company, the Manager shall maintain books and records of the Company. At a minimum, the Company shall keep at its principal place of business the following records:

(a)    A current list of the full name, last known business, residence, or mailing address, and Percentage Interest (if any) of each Member, both past and present;

(b)    Proper and complete records and books of account shall be kept or shall be caused to be kept by the Manager in which shall be entered fully and accurately all transactions and other matters relating to the Company's business in such detail and completeness as is customary and usual for businesses of the type engaged in by the Company. Such books and records shall be maintained substantially in accordance with the accounting principles as provided in Section 9.1 herein; and

(c)      Any other records as may be required to be maintained by the Act.

Upon reasonable request, each Member, or the Member's duly authorized representative, shall have the right, during ordinary business hours, to inspect and copy such Company books, records, and other documents at the requesting Member's expense; and provided, further, that the Manager may, to the maximum extent permitted by applicable law, withhold from any Member (or redact if appropriate) any information that the Manager deems confidential, including, but not limited to, the name, Capital Contributions, Percentage Interests of the other Members, and any other information that does not directly relate to the calculation of the distributions and/or allocations of the requesting Member under this Agreement.

2.6.   Term. The term of the Company commenced on the date the Certificate was filed with the Secretary of State of the State of Delaware and shall continue in until terminated in accordance with the Plan.

## ARTICLE 3
## BUSINESS OF COMPANY

3.1.   Business of the Company. The business of the Company shall be:

(a)      To acquire indirectly through one or more subsidiaries one or more real property investments, as determined by the Manager (each a "Company Investment" and collectively, the "Company Investments");

(b)      To conduct any other business or activity that may be lawfully conducted by a limited liability company organized pursuant to the Act and/or as specifically provided for in the Plan, as determined by the Manager; and

(c)      To engage in all activities necessary, customary, convenient, or incident to either of the foregoing.

The Company shall have all the powers necessary or convenient to carry out the purposes for which it is formed, including all of the powers granted by the Act.

## ARTICLE 4
## MANAGEMENT

4.1.   Management by Manager.

(a)      The business and affairs of the Company shall be managed and controlled exclusively by the Manager. Subject to the provisions of the Plan and this Agreement, the Manager shall have the absolute, exclusive, and complete right, power, authority, obligation, and responsibility vested in or assumed by a manager of a limited liability company under the Act and as otherwise provided by law, including that necessary to make all decisions regarding the business of the Company, and is hereby vested with the absolute, exclusive, and complete right, power, and authority to operate, manage, and control the affairs of the Company and carry out the business of the Company.

(b)     Without limiting the generality of the foregoing, in addition to any other rights and powers which the Manager may possess under applicable law or pursuant to the Plan and this Agreement, the Manager shall have all specific rights, powers, and authorities required or appropriate to the Manager's management of the Company's business and affairs to be exercised in such manner, in such form, at such times, and to such extent as the Manager, in the Manager's best, good faith discretion, determines, which shall include, without limitation, the full power and authority to execute on behalf of the Company any and all agreements, contracts, certificates, leases, subleases, licenses, conveyances, deeds, mortgages, checks, drafts, promissory notes, and other instruments, and the execution thereof by the Manager shall be the only execution necessary to bind the Company thereto. The Manager shall have the right, by separate instrument or document, to authorize any Officer to execute any document on behalf of the Company and any such documents executed by such Officer shall be binding upon the Company.

(c)     The foregoing authority and powers of the Manager shall be expressly subject to the limitations of the Oversight Committee as set forth in Article V herein.

4.2.    <u>Tenure and Qualifications</u>. A Person serving as Manager shall hold office until such Person's death, incapacity, dissolution, or removal. The Manager may only be removed for gross negligence or willful misconduct by a vote of three-fourths of the Oversight Committee and a vote of three-fourths of Class A Members. A Manager need not be a Member or a natural person.

4.3.    <u>Time Devoted; Other Activities</u>. The Manager shall devote such time to the business and the affairs of the Company as the Manager shall reasonably deem necessary to properly conduct such business and affairs in accordance with the Plan and this Agreement and applicable law. Unless approved by the Oversight Committee, the Manager shall exclusively devote his or her business time or business resources to the business of the Company. During the term of the Company, the Manager and its Affiliates shall not seek to acquire or acquire any distressed real property investments except through the Company and its subsidiaries.

4.4.    <u>Vacancies</u>. In the event of any vacancy occurring in the position of Manager for any reason, the Class B Members shall promptly select and appoint a Person to serve as Manager pursuant to a Majority Vote of the Class B Members. Any Person appointed as Manager pursuant to this Section 4.4 shall serve as Manager until such Person's death, incapacity, or dissolution, and shall have all of the rights and obligations of the prior Manager of the Company.

4.5.    <u>Officers</u>. The Manager may appoint individuals as officers of the Company as the Manager deems necessary or desirable to carry on the business of the Company (collectively, the "<u>Officers</u>"). The initial officers of the Company will be Steffens (CEO), Gina Milano (COO), and Michael Bennett (CFO). The Manager must obtain approval of the Oversight Committee to create any officer position and to appoint any additional officer. The Manager may delegate to such Officers such power and authority as the Managers deems advisable. No Officer need be a Member or Manager. Any individual may hold two or more offices of the Company. Each Officer shall hold office until his successor is designated by the Manager or until his earlier death, incapacity, resignation, or removal. Any Officer may resign at any time upon written notice to the Manager. Any Officer may be removed by the Manager with or without cause at

any time. A vacancy in any office occurring because of death, resignation, removal or otherwise, may, but need not, be filled by the Manager.

4.6.    No Personal Liability. Except as expressly provided in this Agreement or otherwise required by the Act, the Manager shall not be obligated personally for any debt, obligation, or liability of the Company, whether arising in contract, tort, or otherwise, solely by reason of being the Manager.

**ARTICLE 5**
**OVERSIGHT COMMITTEE**

5.1.    Composition. The Oversight Committee shall be compromised of five Class A Members (the "Oversight Committee Members"). The initial Oversight Committee Members are listed on Schedule C. Each Oversight Committee Member shall remain on the Oversight Committee until the earlier of their death, incapacity, or resignation. DS shall have the right to remain on the Oversight Committee until DS ceases to be a Class A Member. For the avoidance of doubt, the Manager shall not have the ability to remove any Oversight Committee Member. Subsequent Oversight Committee Members shall be nominated by the Manager, and approved by a majority of the existing Oversight Committee Members.

5.2.    Actions Requiring Approval of Oversight Committee. The Oversight Committee shall have the sole authority with respect to the following actions and decisions:

(a)    approval of the appointment of all officers proposed by the Manager;

(b)    approval of the Company's annual budget proposed by the Manager, which shall include a variance in excess of fifteen percent on a total-distribution cumulative basis and fifteen percent on a line-item basis; the Manager will submit the 2022 budget to the Oversight Committee within thirty days of the Effective Date;

(c)    approval of any transaction that exceeds the variance established in the annual budget;

(d)    approving procedures to release funds from the lockbox bank account proposed by the Manager;

(e)    approval of expenditures related to Company Investments on or after [•], including all financing terms associated with the procurement of Company Investments; for the avoidance of doubt, the Abe's Fly Shop, South Fork 42 Acres, and Vero Vista projects, which are existing projects, are exempt from this subsection (e);

(f)    approval of the retention of an accredited accounting firm proposed by the Manager for the Company and any subsidiaries owned by the Company;

(g)    receipt and review of an annual audit report performed by the accredited accounting firm approved by the Oversight Committee;

(h)     receipt and review of monthly financials of the Company and its direct and indirect subsidiaries presented by the Manager within thirty days after the end of each month;

(i)     approval of Distributions to Members on a quarterly basis as authorized by the Plan;

(j)     approval of terms of all future capital contributions to the Company and any subsidiaries owned by the Company as proposed by the Manager;

(k)     approval of terms proposed by the Manager to convert Membership Interests into direct investments in Company Investments;

(l)     approval of changes in compensation of any chief executive officer including Steffens, whose initial salary is set at $180,000.00 per year; and

(m)     approval of the business time or business resources that the Manager may devote outside of the business of the Company;

5.3.   <u>Voting Rights</u>. Except as provided for in Sections 4.2 and 5.1, all decisions of the Oversight Committee shall require approval of a majority of the Oversight Committee Members.

5.4.   <u>Conflict</u>. To the extent of any conflict between the powers of the Manager set forth in Article 4 and the limitations imposed upon the Manager as set forth in Article 5.2, Article 5.2 shall control and govern.

## ARTICLE 6
## MEMBERS

6.1.   <u>Classes of Membership Interest</u>. All Membership Interest in the Company shall be represented by Units. The Company shall have two classes of Units, designated as Class A Units and Class B Units, with the respective rights and privileges set forth in this Agreement.

6.2.   <u>Units; Member Information</u>.

(a)     The Membership Interests of the Class A Members shall be represented by issued and outstanding Class A Units. Each Class A Member shall be issued a number of Class A Units equal to such Class A Member's Claim Amount divided by $5,000.00 and carried through to the second decimal point. As an example only, a Class A Member with a Claim Amount of $13,250.00 shall be issued 2.65 Class A Units. Each Class A Member shall have the number of Class A Units as set forth opposite that Class A Member's name on <u>Schedule A</u>.

(b)     The Membership Interests of the Class B Members shall be represented by issued and outstanding Class B Units. Each Class B Member shall have the number of Class B Units as set forth opposite that Class B Member's name on <u>Schedule B</u>.

(c)     The Manager shall cause to be maintained a schedule of all Members (the "<u>Members Schedule</u>") containing the name, mailing address, Claim Amount, and Units of each Member. The Manager shall update the Members Schedule from time to time as necessary to

reflect any issuance or Transfer of Units to any new or existing Member or any other change in the membership of the Company, which shall not constitute an amendment to this Agreement requiring the consent or approval of any Member.

      6.3.   <u>Admission of New Members</u>.

      (a)   Any Person approved by the Manager may, subject to the terms and conditions of the Plan and this Agreement, become a "<u>Substitute Member</u>" as a transferee of a Member's Units, or any portion thereof, in either case, following compliance with the provisions of Section 6.3(b).

      (b)   In order for any Person not already a Member of the Company to be admitted as a Member, pursuant to a Transfer of Units, such Person shall have executed and delivered to the Company a written joinder to this Agreement evidencing such Person's consent to be bound by the provisions of the Plan and this Agreement. Any Person executing a written joinder shall have represented and warranted to the Company that such Person has complied with all requirements of the Bankruptcy Code, if any, to receive the Transfer of Units. Upon the amendment of the Members Schedule by the Manager and the satisfaction of any other applicable conditions, including, if a condition, the receipt by the Company of payment for the issuance of the applicable Units, such Person shall be admitted as a Member.

      6.4.   <u>No Participation in Management</u>. Except for those matters or actions that specifically require the consent or approval of the Members pursuant to the terms of this Agreement, no Member (acting in such capacity) shall participate in the management or control of the business and affairs of the Company. No Member (acting in such capacity) shall have any authority or right to act on behalf of the Company or bind the Company in connection with any matter or the transaction of any business. No Member shall have any rights and powers with respect to the Company, except as provided in the Act or by this Agreement.

      6.5.   <u>Voting Rights</u>. Unless expressly provided for in this Agreement or expressly required by mandatory provisions of the Act, no Member shall have the right to vote on, consent to, approve, or otherwise take action with respect to any matter or decision relating to the Company or its business and affairs. Whenever the vote, consent, or action of the Members is required pursuant to the provisions of this Agreement, (a) such vote, consent, or action shall be deemed to require a Majority Vote of the Class B Members; and (b) each Class B Member shall be entitled one vote for each Class B Unit held by such Class B Member.

      6.6.   <u>Action by Written Consent</u>. Any action or vote required or permitted to be taken by the Members may be taken without a meeting and without prior notice if the action or vote is evidenced by one or more written consents describing the action taken, signed by Members holding sufficient Units to constitute a Majority Vote, and delivered to the Manager for inclusion in the Company's records. Any action or vote taken under this Section 6.6 shall be effective when the requisite Members have signed the consent, unless the consent specifies a different effective date. The record date for determining Members entitled to take action or vote without a meeting shall be the date the first Member signs the written consent.

6.7. <u>Other Activities</u>. During the term of the Company, each Member and its Affiliates may engage in any business activity for such Member's own profit or advantage. No Member, or any Affiliate of a Member, shall be obligated to account to the Company or to the other Members for any profits or income earned or derived from outside activities or businesses. No Member, or any Affiliate of a Member, shall be obligated to inform the Company or the Members of any business opportunity of any type or description.

6.8. <u>Limitation of Liability</u>. Except as otherwise required by the Act, no Member will be obligated personally for any debt, obligation, or liability of the Company, or the other Members, whether arising in contract, tort, or otherwise, solely by reason of being a Member.

6.9. <u>Redemption</u>. Once a Class A Member has received distributions pursuant to Section 8.4(a) which, in the aggregate, equal 125% of the Class A Member's Claim Amount, such Class A Member's Class A Units shall be automatically deemed to have been redeemed by the Company (without further action being required by the applicable Class A Member, the Manager, the Company, or any other Person), such Class A Member shall not be entitled to any further distributions from the Company, and such Class A Member shall cease to be a Class A Member.

## ARTICLE 7
## COMPANY INVESTMENTS AND CAPITAL ACCOUNTS

7.1. <u>Members' Interests in Company Investments</u>. Members shall not have a direct interest in any Company Investment on account of its Membership Interest, provided, the Manager may allow, subject to Oversight Committee approval, Members to convert their Membership Interests into direct investments in Company Investments.

7.2. <u>Contributions</u>. No Member shall have any obligation to make Capital Contributions to the Company or to loan or otherwise provide funds to the Company, even if the failure to do so could result in a default by the Company or in any other consequence adverse to the Company; provided, however, the Manager or an Affiliate may contribute capital (as debt or equity) to the Company as Manager may determine is necessary.

7.3. <u>Capital Accounts</u>.

(a)     The Company shall maintain a single capital account for each Member in accordance with the rules of Treasury Regulation Section 1.704-l(b)(2)(iv) ("<u>Capital Account</u>").

(b)     In the event of a Transfer made in accordance with this Agreement, the Capital Account of the transferring Member shall become the Capital Account of the transferee to the extent it relates to the transferred Unit(s) in accordance with Treas. Reg. § 1.704-1(b)(2)(iv).

(c)     In the event that any Member shall have a deficit balance in its Capital Account, such Member shall have no obligation, during the term of the Company or upon dissolution or liquidation of the Company, to restore such negative balance or make any Capital Contributions to the Company by reason thereof, except as may be required by applicable law.

## ARTICLE 8
## ALLOCATIONS AND DISTRIBUTIONS

8.1.    <u>Allocation of Profits and Losses</u>.

(a)    Except as otherwise provided in this Agreement, for each Fiscal Year (or portion thereof), Net Profits and Net Losses (and, to the extent necessary, individual items of income, gain, loss or deduction) of the Company shall be allocated among the Members in a manner such that, after giving effect to all Capital Contributions and distributions and any special allocations required pursuant to Section 8.2 for the current and all prior Fiscal Years, the Capital Account balance of each Member, immediately after making the allocations under this Section 8.1, is (as nearly as possible) equal to (i) the aggregate amount that would be distributed to such Member if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their Book Value, all Company liabilities were satisfied (limited with respect to each Nonrecourse Liability to the Book Value of the assets securing such liability), and the net assets of the Company were distributed to the Members pursuant to Section 10.2, *minus* (ii) such Member's share of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain.

(b)    To the extent that any loss or deduction otherwise allocable to a Member causes such Member to have a Deficit Capital Account as of the end of the Fiscal Year to which such loss or deduction relates, such loss or deduction shall instead be allocated to the other Member(s) in proportion to their positive Capital Account balances, until their Capital Accounts are all reduced to zero, then the remainder shall be allocated to the Members in proportion to their Units.

8.2.    <u>Regulatory and Special Allocations</u>. The provisions of Sections 7.3 and 8.1 are intended to comply with Treasury Regulations Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Regulation. In furtherance of the foregoing, Section 704 of the Code and the Regulations issued thereunder, including, but not limited to, the provisions of such Regulations addressing qualified income offset provisions, minimum gain chargeback requirements, and allocations of deductions attributable to nonrecourse debt and partner nonrecourse debt (as defined in Treasury Regulations Section 1.704-2(b)(4)), are hereby incorporated by reference. If, as a result of the provisions of Section 704 of the Code and such Regulations, Net Profits or Net Losses are allocated to the Members in a manner that is inconsistent with the manner in which the Members intend to allocate such items as reflected in Section 8.1, to the extent permitted under such Regulations, items of future income and loss shall be allocated among the Members so as to prevent such allocations from distorting the manner in which in which the Members intend to allocate such items as reflected in Section 8.1. The Manager shall be authorized to make appropriate amendments to the allocations of items pursuant to Section 8.1 if necessary in order to comply with Section 704 of the Code or applicable Regulations thereunder.

8.3.    <u>Tax Allocations</u>. For United States federal, state and local income tax purposes, items of income, gain, loss, deduction, and credit shall be allocated to the Members in accordance with the allocations of the corresponding items for Capital Account purposes under the foregoing provisions of this Article 8, except that items with respect to which there is a difference between the adjusted basis of such property to the Company for federal income tax

purposes and its Book Value will be allocated in accordance with Section 704(c) of the Code, the Treasury Regulations thereunder, and Treasury Regulations Section 1.704-1(b)(4)(i).

8.4.   <u>Distributions of Available Cash</u>. The Manager may, at any time and from time to time, and with the approval of the Oversight Committee, cause the Company to make distributions of Available Cash as the Manager deems appropriate and in accordance with the Plan; provided, however, upon disposition of any Company Investment, the Manager will use reasonable efforts to cause the Company to distribute any Available Cash attributable to such Company Investment within ninety days after such disposition.

(a)   Subject to Section 8.5 and Section 11.2, seventy percent of any distribution of Available Cash shall be made as follows:

(i)   First, to the Class A Members, *pro rata*, in proportion to their Percentage Interests as identified on <u>Schedule A</u> hereto, until each Class A Member has received an aggregate amount of distributions equal to 125% of such Class A Member's Claim Amount; and

(ii)   Thereafter, to the Class B Members, *pro rata*, in proportion to their Percentage Interests as identified on <u>Schedule B</u> hereto.

(b)   For the avoidance of doubt, no Class B Member shall receive a distribution, on account of owning a Class B Unit, unless and until all Class A Members have received an aggregate amount of distributions equal to 125% of the total amounts attributable to their Class A Units as identified on <u>Schedule A</u> hereto.

(c)   Thirty percent of any distribution of Available Cash shall be used in connection with the compensation packages of the Manager and any other Officer.

(d)   Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any distribution to the Members if such distribution would violate the Act or other applicable law.

8.5.   <u>Tax Distributions</u>. Provided the Company has sufficient Available Cash as reasonably determined by the Manager in consultation with the Company's accountants, the Company shall make a tax distribution to each Member on or before April 15 of each year in an amount equal to the Assumed Tax Rate multiplied by the total income allocated to such Member (or estimated to be allocated to such Member) on such Member's K-1 for the prior tax year, less distributions made to such Member pursuant to Section 8.4(a) in the prior tax year. All tax distributions made pursuant to this Section 8.5 shall be treated for purposes of this Agreement as advances on distributions pursuant to Section 8.4(a), and shall reduce, dollar-for-dollar, the amount otherwise distributable to such Member pursuant thereto. For purposes hereof, "Assumed Tax Rate" shall mean the highest combined federal, state, and local income tax applicable to an individual residing in Denver, Colorado, for the tax year with respect to which the distribution is to be made.

8.6.   <u>Withholding</u>. The Company shall comply with withholding requirements under federal, state, and local law and shall remit amounts withheld to and file required forms with the

applicable jurisdictions. All amounts withheld from Company revenues or distributions by or for the Company pursuant to the Code or any provisions of any state or local law, and any taxes, fees, or assessments levied upon the Company, shall be treated for purposes of this Article 8 as having been distributed to those Members who received tax credits with respect to the withheld amounts, or whose identity or status caused the withholding obligations, taxes, fees, or assessments to be incurred. If the amount withheld was not withheld from the affected Member's actual share of Available Cash, the Company may, at its option: (a) require the affected Member to reimburse the Company for such withholding; or (b) reduce any subsequent distributions by the amount of such withholding. Each Member agrees to furnish the Company with any representations and forms as the Company shall reasonably request to assist it in determining the extent of, and in fulfilling, its withholding obligations.

8.7.   <u>Allocations in Respect of Transferred Units</u>. In the event of any Transfer of Units during any Fiscal Year made in compliance with the provisions of this Agreement, Net Profits, Net Losses, and other items of income, gain, loss, and deduction of the Company attributable to such Units for such Fiscal Year shall be determined using any method permitted under the Code, as determined by the Manager in its sole discretion.

## ARTICLE 9
## ACCOUNTING; REPORTS; TAX MATTERS

9.1.   <u>Accounting Principles.</u> The Net Profits and Net Losses of the Company shall be determined under the method of accounting generally accepted and applied on a consistent basis for companies similar to the Company as recommended by the Company's independent accountants and as approved by the Manager.

9.2.   <u>Banking</u>. The Manager shall cause the Company's funds to be maintained in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of the Manager, the Members, or any other Person. The funds in said accounts shall be used solely for the business of the Company, and all withdrawals from said accounts are to be made only by the Manager or such other Person or Persons as the Manager may from time to time designate.

9.3.   <u>Lockbox</u>. All funds received by the Company, including, but not limited to, all funds received on account of the Company's interest in RI-2 SubCo, shall be deposited in one bank account. The funds deposited in this bank account shall be released to the operating account in accordance with the procedures proposed by the Manager and approved by the Oversight Committee, and consistent with the annual budget approved by the Oversight Committee. All investor distributions shall be made form the lockbox account.

9.4.   <u>Investment Reports</u>. The Manager shall cause the Company to distribute to the Members any information and reports received by the Company from any Company Investment. For the avoidance of doubt, the Manager shall have no independent obligation to obtain or provide any other information regarding any Company Investment to any Member.

9.5.   <u>Tax Information</u>. Within ninety days after the close of each Fiscal Year (subject to reasonable delays due to late receipt of necessary information regarding Company Investments),

the Manager shall cause to be prepared and furnished to each Member at the Company's expense a statement of the amount of such Member's share of the Company's taxable income or loss for such Fiscal Year and information relating to the nature thereof (including copies of IRS Schedule K-1), in sufficient detail to enable such Member to prepare its federal, state, and local income tax and information returns.

9.6.    Returns and Other Elections. The Manager shall cause the preparation and timely filing of all tax returns required to be filed by the Company pursuant to the Code and all other tax returns required in each jurisdiction in which the Company does business. Upon written request, copies of such returns will be furnished to the Members within a reasonable time after the filing thereof. All tax elections permitted to be made by the Company under federal or state laws shall be made by the Manager. The Manager is hereby authorized and shall take all actions necessary to qualify the Company as a partnership for federal income tax purposes in accordance with the Code and the Treasury Regulations.

9.7.    Partnership Representative. The Members hereby appoint William Travis Steffens as the "partnership representative" as provided in Section 6223(a) of the Code (the "Partnership Representative"). Each Member by the execution of this Agreement consents to such designation of the Partnership Representative and agrees to execute, certify, acknowledge, deliver, swear to, file, and record at the appropriate public offices such documents as may be necessary or advisable to evidence such consent.

(a)    The Partnership Representative is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by taxing authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. Each Member agrees to cooperate with the Partnership Representative and to do or refrain from doing any or all things reasonably requested by the Partnership Representative with respect to the conduct of examinations by taxing authorities and any resulting proceedings. Each Member agrees that any action taken by the Partnership Representative in connection with audits of the Company shall be binding upon such Member and that such Member shall not independently act with respect to tax audits or tax litigation affecting the Company. The Partnership Representative shall promptly notify the Members if any tax return of the Company is audited and upon the receipt of a notice of final partnership administrative adjustment or final partnership adjustment. The Partnership Representative may make any determination regarding whether the Company (either on its own behalf or on behalf of the Members) will contest or continue to contest any tax deficiencies assessed or proposed to be assessed by any taxing authority.

(b)    To the extent permitted by applicable law and regulations, the Company will annually elect out of the BBA Partnership Audit Rules pursuant to Code Section 6221(b). In the event of an audit of the Company that is subject to the BBA Partnership Audit Rules, the Partnership Representative shall have the authority to make any elections or take any actions that are available to be made or taken by the Partnership Representative or the Company under the BBA Partnership Audit Rules (including any election under Code Section 6226). If an election under Code Section 6226(a) is made, the Company shall furnish to each Member for the year under audit a statement of the Member's share of any adjustment set forth in the notice of final

partnership adjustment, and each Member shall take such adjustment into account as required under Code Section 6226(b).

(c)     Each Member agrees that such Member shall not treat any Company item inconsistently on such Member's federal, state, foreign, or other income tax return with the treatment of the item on the Company's return. Any deficiency for taxes imposed on any Member (including penalties, additions to tax or interest imposed with respect to such taxes and any tax deficiency imposed pursuant to Code Section 6226) will be paid by such Member and if required to be paid (and actually paid) by the Company, will be recoverable from such Member. To the extent that the Partnership Representative does not make an election under Code Section 6221(b) or Code Section 6226, the Company shall use commercially reasonable efforts to (i) make any modifications available under Code Section 6225(c)(3), (4), and (5), and (ii) if requested by a Member, provide to such Member information allowing such Member to file an amended federal income tax return, as described in Code Section 6225(c)(2), to the extent such amended return and payment of any related federal income taxes would reduce any taxes payable by the Company.

(d)     The provisions of this Section 9.6 shall survive the dissolution of the Company and/or the termination of this Agreement. The provisions of this Section 9.6 shall continue to apply to and be binding upon a Person following any Transfer of such Person's Units or any other event that causes such Person to cease to be a Member.

## ARTICLE 10
## TRANSFERS

10.1.   Transfer Restrictions. No Member shall have the right or power to Transfer all or any portion of its Units, except with the prior written consent of the Manager.

10.2.   Compliance with Securities Laws. Notwithstanding any other provision of this Agreement, each Member agrees that it will not, directly or indirectly, Transfer all or any portion of its Units, and the Company agrees that it shall not issue any Units:

(a)     except as permitted under the Federal Act and other applicable federal or state securities or blue sky laws, and then, with respect to a Transfer of Units, if requested by the Company, only upon delivery to the Company of an opinion of counsel in form and substance satisfactory to the Manager to the effect that such Transfer may be effected without registration under the Federal Act;

(b)     if such Transfer or issuance would cause the Company to be considered a "publicly traded partnership" under Section 7704(b) of the Code within the meaning of Treasury Regulations Section 1.7704-1(h)(1)(ii), including the look-through rule in Treasury Regulations Section 1.7704-1(h)(3);

(c)     if such Transfer or issuance would affect the Company's existence or qualification as a limited liability company under the Act;

(d)     if such Transfer or issuance would cause the Company to lose its status as a partnership for federal income tax purposes;

(e)      if such Transfer or issuance would cause the Company or any Affiliate to be required to register as an investment company under the Investment Company Act of 1940, as amended;

(f)      if such Transfer or issuance would cause the Manager or any Affiliate to be required to register as an investment adviser under the Investment Advisers Act of 1940, as amended; or

(g)      if such Transfer or issuance would cause the assets of the Company or any Affiliate to be deemed "Plan Assets" as defined under the Employee Retirement Income Security Act of 1974 or its accompanying regulations or result in any "prohibited transaction" thereunder involving the Company or any Affiliate.

10.3.   <u>Transfers in Contravention of Restrictions</u>. Any Transfer or attempted Transfer of any Units in violation of this Agreement shall be null and void, no such Transfer shall be recorded on the Company's books or otherwise recognized by the Company, and the purported transferee in any such Transfer shall not be treated (and the purported transferor shall continue be treated) as the owner of such Units for all purposes of this Agreement. Each Member hereby acknowledges the reasonableness of the restrictions on the Transfer of Units imposed by this Agreement in view of the Company purposes and the relationship of the Members. Accordingly, the restrictions on Transfer contained herein shall be specifically enforceable.

10.4.   <u>Rights of Transferee</u>. Any Transferee of a Member's Units that is not admitted to the Company as a Member pursuant to Section 6.2 shall be entitled only to allocations and distributions with respect to the Units held by such Transferee in accordance with this Agreement, and to the fullest extent permitted by law, shall not be entitled to (a) vote on or otherwise participate with respect to any Company matters, (b) receive any information or accounting of the affairs of the Company, (c) inspect the books or records of the Company, or (d) any other rights of a Member under the Act or this Agreement; provided, however, the Units held by such Transferee and any future Transfers thereof shall be subject to all of the provisions of this Agreement to the same extent and in the same manner as if such Transferee had been admitted as a Member.

## ARTICLE 11
## DISSOLUTION AND TERMINATION

11.1.   <u>Dissolution</u>. The Company shall be dissolved and its affairs wound up only upon the occurrence of one of the following events:

(a)      The Manager has fulfilled all terms of the Plan; or

(b)      The entry of a decree of judicial dissolution under the Act.

11.2.   <u>Winding Up, Liquidation, and Distribution of Assets</u>.

(a)      Upon dissolution of the Company, the Manager shall wind up the affairs of the Company and proceed within a reasonable period of time to sell or otherwise liquidate the assets of the Company, subject to obtaining fair value for such assets and any tax or other legal

considerations, and shall apply and distribute the proceeds therefrom in the following order of priority:

(i)      First, to pay all outstanding debts and liabilities of the Company (to the extent that such debts and liabilities are then due), including all expenses of liquidation;

(ii)     Second, to fund a reasonable reserve for any contingent or unforeseen liabilities or obligations of the Company (after passage of a reasonable time, the balance, if any, in said reserve shall be distributed as set forth below); and

(iii)    Third, to the Members in accordance with Section 8.4(a). Such distribution shall be made after (A) the final allocations of Article 8 in connection with the dissolution of the Company and the liquidation of its assets have been made, and (B) all such events, transactions, and allocations have been fully reflected in the Members' Capital Accounts, as required by Treasury Regulation Section 1.704-1(b). Such distribution required by this Section 11.2(a)(iii) shall be made as soon as possible after the date of the Company's dissolution. Distributions pursuant to this Section 11.2(a)(iii) may be made to a trust established for the benefit of the Members for the purposes of liquidating the Company's assets, collecting amounts owed to the Company, and paying any contingent or unforeseen liabilities or obligations of the Company arising out of or in connection with the former business and/or operations of the Company. The assets of any such trust shall be distributed to the Members, from time to time, in the reasonable discretion of the Manager, in the same proportions as the amount distributed to such trust by the Company would otherwise have been distributed to the Members pursuant to this Agreement.

(b)      The Manager shall comply with any requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets. The Manager shall file a Certificate of Cancellation in accordance with the Act and shall take such other actions as may be necessary to terminate the Company.

11.3.    Requirements Upon "Liquidation". Notwithstanding anything set forth in this Agreement to the contrary, if the Company is "liquidated" (or if any Member's Units in the Company are "liquidated") (as that term is defined in Treasury Regulations Section 1.704-1(b)(2)(ii)(g)) and any Member's Capital Account (or, as the case may be, the Capital Account of the Member whose Interest is "liquidated") has a deficit balance, such Member(s) shall have no obligation to contribute all or any portion of such deficit balance to the capital of the Company.

11.4.    Return of Contribution Nonrecourse. Except as provided by law, upon dissolution, each Member shall look solely to the assets of the Company for the return of its Capital Contributions. If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the Capital Contributions of each Member, such Member shall have no recourse against the Company, the Manager or any other Member.

## ARTICLE 12
## EXCULPATION AND INDEMNIFICATION

12.1.   <u>Standard of Care</u>. No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage, or claim incurred by reason of any action taken or omitted to be taken by such Covered Person in his, her, or its capacity as a Covered Person, except in the case of any act or omission with respect to which a court of competent jurisdiction (or other similar tribunal) has issued a final and non-appealable decision, judgment, or order that such act or omission resulted from such Covered Person's bad faith, gross negligence, willful misconduct, fraud, or a material breach of this Agreement. No Covered Person in any way guarantees the return of any Member's capital or a profit from the operations of the Company, and no Covered Person shall be responsible to any Member because of a loss of such Member's investment or a loss in operations; provided, however, that the foregoing shall not limit any Covered Person's liability in connection with any act or omission with respect to which a court of competent jurisdiction (or other similar tribunal) has issued a final and non-appealable decision, judgment or order that such act or omission resulted from such Covered Person's bad faith, gross negligence, willful misconduct, fraud, or a material breach of this Agreement.

12.2.   <u>Liabilities and Duties of Covered Persons</u>.

(a)   This Agreement is not intended to, and does not, create or impose any fiduciary duty on any Covered Person. Furthermore, each of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied by Applicable Law, and in doing so, acknowledges and agrees that the duties and obligations of each Covered Person to each other and to the Company are only as expressly set forth in this Agreement. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person.

(b)   Whenever in this Agreement a Covered Person is permitted or required to make a decision (including a decision that is in such Covered Person's "discretion" or under a grant of similar authority or latitude), the Covered Person shall be entitled to consider only such interests and factors as such Covered Person desires, including its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person. Whenever in this Agreement a Covered Person is permitted or required to make a decision in such Covered Person's "good faith," the Covered Person shall act under such express standard and shall not be subject to any other or different standard imposed by this Agreement or any other applicable law.

12.3.   <u>Indemnification</u>.

(a)   To the fullest extent permitted by the Act, as the same now exists or may hereafter be amended, substituted, or replaced (but, in the case of any such amendment, substitution, or replacement only to the extent that such amendment, substitution, or replacement permits the Company to provide broader indemnification rights than the Act permitted the Company to provide prior to such amendment, substitution, or replacement), the Company shall indemnify, hold harmless, defend, pay, and reimburse any Covered Person against any and all

losses, claims, damages, judgments, fines, or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines, or liabilities, and any amounts expended in settlement of any claims (collectively, "Damages") incurred by such Covered Person arising out of or relating to this Agreement or the Company, except in the case of any act or omission with respect to which a court of competent jurisdiction (or other similar tribunal) has issued a final and non-appealable decision, judgment or order that such act or omission resulted from such Covered Person's bad faith, gross negligence, willful misconduct, fraud or a material breach of this Agreement. Notwithstanding anything contained herein to the contrary, any indemnity by the Company relating to the matters covered in this Section 12.3 shall be provided out of and to the extent of Company assets only, and no Member (unless such Member otherwise agrees in writing) shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity by the Company.

(b)     Expenses reasonably incurred by a Covered Person in defense or settlement of any claim that may be subject to a right of indemnification hereunder shall be advanced by the Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of such Covered Person to repay such amount to the extent that it is ultimately determined that such Covered Person is not entitled to be indemnified hereunder. The termination of a proceeding or claim against a Covered Person by settlement or a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that any Covered Person's conduct constituted bad faith, gross negligence, willful misconduct, fraud, or a material breach of this Agreement.

(c)     The indemnification provided by this Section 12.3 shall not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled under any agreement or otherwise. The provisions of this Section 12.3 shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this Section 12.3 and shall inure to the benefit of the executors, administrators, legatees, and distributees of such Covered Person.

(d)     The provisions of this Section 12.3 shall be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this Section 12.3 is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound. No amendment, modification, or repeal of this Section 12.3 that adversely affects the rights of a Covered Person to indemnification for Damages incurred or relating to a state of facts existing prior to such amendment, modification, or repeal shall apply in such a way as to eliminate or reduce such Covered Person's entitlement to indemnification for such Damages without the Covered Person's prior written consent. If this Section 12.3 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to this Section 12.3 to the fullest extent permitted by any applicable portion of this Section 12.3 that shall not have been invalidated and to the fullest extent permitted by applicable law. The provisions of this Section 12.3 shall survive the dissolution, liquidation, winding up, and termination of the Company.

## ARTICLE 13
## MISCELLANEOUS PROVISIONS

13.1.   <u>Confidentiality</u>. Each Member hereby agrees not to disclose the identity of the Members (or the beneficial owner(s) of any of them) unless such disclosure is required by applicable law, by any lender to the Company, in connection with the creation of bank accounts for Company business, or after written consent has been obtained from such Person; provided, however, that notwithstanding the foregoing any party to this Agreement (and each employee, representative, or other agent of any party to this Agreement) may disclose to and consult with its employees, agents, advisors, accountants, attorneys, and consultants related to the tax treatment and tax structure or to seek advice regarding this Agreement or the transactions contemplated by this Agreement.

13.2.   <u>Entire Agreement</u>. The terms of the Plan and this Agreement contains the entire understanding among the parties hereto with respect to the subject matter hereof and supersedes any prior written or oral, agreements among them or any of them regarding the subject matter hereof. There are no representations, agreements, arrangements, or understandings, oral or written, among the parties hereto relating to the subject matter hereof which are not fully expressed herein.

13.3.   <u>Conflicts</u>. To the extent that the terms of the Plan conflict with the terms of this Agreement, the terms of the Plan shall govern and control.

13.4.   <u>Amendments</u>.

(a)     This Agreement may be amended or modified pursuant to a written instrument executed by the Manager. Any such written amendment or modification will be binding upon the Company and each Member.

(b)     Unless specified herein, no amendment shall be effective as to any Member without the consent of such Member that:

(i)     materially and adversely affects such Member in a different manner than all the other Members having similar rights and obligations;

(ii)     increases in any material respect the aggregate Capital Contributions required from such Member;

(iii)     reduces (or otherwise adversely affects) such Member's share of the Company's distributions, income, gains, or losses, except as a result of the admission of additional Members, increases in Capital Contributions, defaults, withdrawals, or Transfers; or

(iv)     adversely affects the limited liability of such Member under this Agreement or the Act.

(c)     The Manager shall furnish each Member with a copy of each amendment to this Agreement promptly after its adoption.

13.5.   <u>Notices</u>. All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient; or (d) on the fifth business day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid, addressed to each recipient's address as it appears in the Company's records, as appropriate. Each party hereto may request that written notices and other communications be sent to such other place and with such other copies as such party may designate as to itself by written notice to the other parties.

13.6.   <u>Governing Law</u>. All issues and questions concerning the application, construction, validity, interpretation, and enforcement of this Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Delaware.

13.7.   <u>Attorneys' Fees</u>. If any action or proceeding (including arbitration) to enforce this Agreement or any provision hereof is brought by any party hereto, the substantially prevailing party, as determined by the trier of fact, shall be awarded its attorneys' fees and its costs and expenses of suit, including reasonable attorneys' and consultants' fees. If any party hereto secures a judgment in any proceeding brought to enforce or interpret this Agreement, then any cost or expense incurred in enforcing or in successfully appealing from such judgment, including, without limitation, reasonable attorneys' fees shall be paid by the party or parties against whom such judgment has been rendered or against whom an appeal is won, and shall be recoverable separately from and in addition to any other amount included in such judgment. This section is intended to be severable from the other provisions of this Agreement and to survive and not be merged into any such judgments. For the avoidance of doubt, this section does not extend to any proceedings, disputes, or contested matters regarding Professional Fee Claims (as such term is defined in the Plan).

13.8.   <u>Waiver of Jury Trial</u>. THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT THAT ANY PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER DOCUMENTS EXECUTED IN CONNECTION HEREWITH, OR IN RESPECT OF ANY COURSE OF CONDUCT, STATEMENTS (WHETHER ORAL OR WRITTEN), OR ACTIONS OF ANY PARTY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR EACH OF THE PARTIES TO ENTER INTO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY.

13.9.   <u>Execution of Additional Instruments</u>. In connection with this Agreement and the transactions contemplated hereby, each Member hereby agrees, at the request of the Manager, to execute and deliver such additional documents, instruments, conveyances, and assurances, and to

take such further actions as may be required to carry out the provisions hereof and give effect to the transactions contemplated hereby.

13.10. <u>Construction</u>. For purposes of this Agreement, (a) the words "include," "includes," and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this Agreement as a whole. The definitions given for any defined terms in this Agreement shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms The headings in this Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision hereof. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

13.11. <u>Waivers</u>. The waiver of any breach or default of any of the terms, provisions or covenants of this Agreement shall not be deemed to be, nor shall the same constitute, a waiver of any subsequent breach or default of such term, provision or covenant or of any other term, provision, or covenant contained herein.

13.12. <u>Severability</u>. If any term or provision of this Agreement is held to be invalid, illegal or unenforceable under applicable law in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible.

13.13. <u>Successors and Assigns</u>. Subject to the restrictions on Transfers set forth herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors, and assigns.

13.14. <u>Third-Party Beneficiaries</u>. Except as expressly provided to the contrary in this Agreement (including those provisions which are for the benefit of the Covered Persons), this Agreement is for the sole benefit of the parties hereto (and their respective heirs, executors, administrators, successors, and assigns) and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

13.15. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

13.16. <u>Legal Representation</u>. EACH PARTY ACKNOWLEDGES AND AGREES THAT MOYE WHITE LLP HAS REPRESENTED ONLY THE MANAGER IN

CONNECTION WITH MANAGER'S BANKRUPTCY CASE, THE PLAN AND THIS AGREEMENT AND THAT MOYE WHITE LLP DOES NOT REPRESENT ANY MEMBER OR THE COMPANY AND SHALL OWE NO DUTIES DIRECTLY TO ANY MEMBER OR THE COMPANY IN CONNECTION WITH THIS AGREEMENT, REGARDLESS OF WHETHER MOYE WHITE LLP HAS IN THE PAST REPRESENTED OR IS CURRENTLY REPRESENTING SUCH PERSON WITH RESPECT TO OTHER MATTERS. IN THE EVENT ANY DISPUTE OR CONTROVERSY (INCLUDING LITIGATION) ARISES BETWEEN THE MANAGER, ON THE ONE HAND, AND ANY MEMBER THAT MOYE WHITE LLP HAS IN THE PAST REPRESENTED OR IS CURRENTLY REPRESENTING WITH RESPECT TO OTHER MATTERS, ON THE OTHER HAND, EACH PARTY AGREES THAT MOYE WHITE LLP MAY (IN ITS DISCRETION) REPRESENT THE MANAGER IN ANY SUCH DISPUTE OR CONTROVERSY TO THE EXTENT PERMITTED BY THE APPLICABLE RULES OF PROFESSIONAL CONDUCT IN ANY JURISDICTION, AND EACH PARTY HEREBY CONSENTS TO SUCH REPRESENTATION.

*[signature pages follow]*

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement to be effective as of the Effective Date.

**MANAGER:**

_____
William Travis Steffens

**MEMBERS:**

All Holders of Allowed Unsecured Claims (as such term is defined in the Plan) whose interests in the Company are notated on Schedule A and all Holders of Interests (as such term is defined in the Plan) whose interests in the Company are notated on Schedule B.

**RI-2 NEWCO, LLC**
**LIMITED LIABILITY COMPANY AGREEMENT**

**EXHIBIT A**

**Definitions**

In addition to other terms specifically defined in this Agreement, the following terms used in this Agreement shall have the following meanings:

(i)        "<u>Act</u>" shall have the meaning set forth in the Recitals.

(ii)        "<u>Affiliate</u>" shall mean, when used with reference to a specified Person, (a) any Person who directly or indirectly Controls, is Controlled by or is under common Control with the specified Person, (b) any Person who is an officer, partner, member or trustee of, or serves in a similar capacity with respect to, the specified Person, or for which the specified Person is an officer, partner, member or trustee or serves in a similar capacity, (c) any Person who, directly or indirectly, is the beneficial owner of fifty percent (50%) or more of any class of equity securities of the specified Person, or of which the specified Person, directly or indirectly, is the beneficial owner of fifty percent (50%) or more of any class of equity securities, and (d) the immediate family of the specified Person (if a natural person).

(iii)        "<u>Agreement</u>" shall mean this Limited Liability Company Agreement, as may be amended.

(iv)        "<u>Available Cash</u>" shall mean, at a particular time, the cash and cash equivalents held by the Company, less such cash reserves as the Manager reasonably determines are necessary to pay on a timely basis Company costs and expenses provided for in the annual budget, including operating costs and expenses, taxes, debt service, capital expenditures and other obligations of the Company, taking into account the anticipated revenues of the Company.

(v)        "<u>BBA Partnership Audit Rules</u>" means the partnership audit procedures enacted under Section 1101 of the Bipartisan Budget Act of 2015.

(vi)        "<u>Book Depreciation</u>" means, with respect to any Company asset for each Fiscal Year, the Company's depreciation, amortization, or other cost recovery deductions determined for federal income tax purposes, except that if the Book Value of an asset differs from its adjusted tax basis at the beginning of such Fiscal Year, Book Depreciation shall be an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero and the Book Value of the asset is positive, Book Depreciation shall be determined with reference to such beginning Book Value using any permitted method selected by the Manager in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g)(3).

(vii)     "Book Value" means, with respect to any Company asset, the adjusted basis of such asset for federal income tax purposes, except as follows:

(a)     the initial Book Value of any Company asset contributed by a Member to the Company shall be the gross fair market value of such Company asset as of the date of such contribution;

(b)     immediately prior to the distribution by the Company of any Company asset to a Member, the Book Value of such asset shall be adjusted to its gross fair market value as of the date of such distribution;

(c)     the Book Value of all Company assets shall be adjusted to equal their respective gross fair market values, as reasonably determined by the Manager, as of the following times:

(1)     the acquisition of an additional Membership Interest in the Company by a new or existing Member in consideration for more than a *de minimis* Capital Contribution;

(2)     the distribution by the Company to a Member of more than a *de minimis* amount of property (other than cash) as consideration for all or a part of such Member's Membership Interest in the Company;

(3)     the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g);

*provided*, that adjustments pursuant to clauses (1) and (2) above need not be made if the Manager determines, in its reasonable discretion, that such adjustment is not necessary or appropriate to reflect the relative economic interests of the Members and that the absence of such adjustment does not adversely and disproportionately affect any Member;

(d)     the Book Value of each Company asset shall be increased or decreased, as the case may be, to reflect any adjustments to the adjusted tax basis of such Company asset pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Account balances pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m); *provided*, that Book Values shall not be adjusted pursuant to this paragraph (d) to the extent that an adjustment pursuant to paragraph (c) above is made in conjunction with a transaction that would otherwise result in an adjustment pursuant to this paragraph (d); and

(e)     if the Book Value of a Company asset has been determined pursuant to paragraph (a) or adjusted pursuant to paragraphs (c) or (d) above, such Book Value shall thereafter be adjusted to reflect the Book Depreciation taken into account with respect to such Company asset for purposes of computing Net Profits and Net Losses.

(viii)     "Capital Account" shall have the meaning set forth in Section 7.4(a).

EXHIBIT A

    (ix)      "<u>Capital Contribution</u>" shall mean the amount of money or the fair market value of any property (other than money) contributed to the Company.

    (x)      "<u>Class A Member</u>" means any Member holding one or more Class A Units in such Member's capacity as such.

    (xi)      "<u>Class A Units</u>" mean any Unit issued by the Company as a Class A Unit.

    (xii)      "<u>Class B Member</u>" means any Member holding one or more Class B Units in such Member's capacity as such.

    (xiii)      "<u>Class B Units</u>" mean any Unit issued by the Company as a Class B Unit.

    (xiv)      "<u>Claim Amount</u>" means, with respect to any Member, the aggregate amount of such Member's Allowed Unsecured Claim (as such terms are defined in the Plan) owed to the Member by R. Investments, RLLP, as of March 4, 2021. Each Member's Claim Amount shall be set forth in the Members Schedule.

    (xv)      "<u>Code</u>" shall mean the Internal Revenue Code of 1986, as amended, or corresponding provisions of subsequent superseding federal revenue laws.

    (xvi)      "<u>Company</u>" shall mean RI-2 NewCo, LLC, a Delaware limited liability company.

    (xvii)      "<u>Company Minimum Gain</u>" means "partnership minimum gain" and has the meaning set forth in Treasury Regulations Sections 1.704-2(b)(2) and 1.704-2(d).

    (xviii)      "<u>Control</u>" means, as to any Person, the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise. The terms "<u>Controlling</u>" and "<u>Controlled by</u>" shall have the correlative meaning of the term Control.

    (xix)      "<u>Covered Person</u>" means (a) each Manager, Member, Officer, employee, agent, or representative of the Company, including the Partnership Representative; and (b) each member, manager, officer, director, stockholder, partner, Affiliate, employee, agent, or representative of any of the foregoing.

    (xx)      "<u>Deficit Capital Account</u>" shall mean with respect to any Member, the deficit balance, if any, in any of such Member's Capital Account as of the end of the taxable year, after giving effect to the following adjustments:

        (a)      Credit to such Capital Account any amount which such Member is obligated to restore pursuant to any express provision of this Agreement or under Treas. Reg. § 1.704-1(b)(2)(ii)(c), as well as any addition thereto pursuant to the next to last sentences of Treas. Reg. §§ 1.704-2(g)(1) and (i)(5), after taking into account thereunder any changes during such year in partnership minimum gain (as determined in accordance with Treas. Reg. § 1.704-2(d)) and in the minimum gain attributable to any partner nonrecourse debt (as determined under Treas. Reg. § 1.704-2(i)(3)); and

(b)    Debit to such Capital Account the items described in Treas. Reg. §§ 1.704-1(b)(2)(ii)(d)(4), (5), and (6).

This definition of Deficit Capital Account is intended to comply with the provisions of Treas. Reg. §§ 1.704-1(b)(2)(ii)(d) and 1.704-2, and will be interpreted consistently with those provisions.

(xxi)    "Entity" shall mean any general partnership, limited liability partnership, limited partnership, limited liability limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative, or association.

(xxii)    "Federal Act" or "Securities Act" means the Securities Act of 1933, as amended.

(xxiii)    "Fiscal Year" means the calendar year, unless the Company is required to have a taxable year other than the calendar year, in which case Fiscal Year shall be the period that conforms to the Company's taxable year.

(xxiv)    "Majority Vote of the Members" or "Majority Vote" means the affirmative vote, consent or approval of those Members entitled to vote who hold more than fifty percent (50%) of the Units held by all Members then entitled to vote.

(xxv)    "Manager" shall initially mean Steffens identified as of the date hereof and each Person who is hereafter appointed as the Manager in accordance with Section 4.4.

(xxvi)    "Member Nonrecourse Debt" has the same meaning as "partner nonrecourse debt" set forth in Treasury Regulations Section 1.704-2(b)(4).

(xxvii)    "Member Nonrecourse Debt Minimum Gain" has the same meaning as "partner nonrecourse debt minimum gain" set forth in Treasury Regulations Section 1.704-2(i)(2) and (3).

(xxviii)    "Member Nonrecourse Deductions" means "partner nonrecourse deductions" within the meaning of Treasury Regulations Section 1.704-2(i)(l) and (2).

(xxix)    "Members" shall mean each Person who executes this Agreement as a Member as of the date hereof and each Person who may hereafter be admitted to the Company as an additional or Substitute Member. Reference to a "Member" shall be to any one of the Members.

(xxx)    "Membership Interest" or "Interest" means the entire ownership interest of a Member in the Company at any particular time, including the right of such Member to any and all benefits to which a Member may be entitled as provided in this Agreement, together with the obligations of such Member to comply with all of the terms and provisions of this Agreement.

(xxxi)    "Net Profits" or "Net Losses" means, for each Fiscal Year or other period specified in this Agreement, an amount equal to the Company's taxable income or taxable loss, or particular items thereof, determined in accordance with Code Section 703(a) (where, for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or taxable loss), but with the following adjustments:

EXHIBIT A

(a)     any income realized by the Company that is exempt from federal income taxation, as described in Code Section 705(a)(1)(B), shall be added to such taxable income or taxable loss, notwithstanding that such income is not includable in gross income;

(b)     any expenditures of the Company described in Code Section 705(a)(2)(B), including any items treated under Treasury Regulation Section 1.704-1(b)(2)(iv)(i) as items described in Code Section 705(a)(2)(B), shall be subtracted from such taxable income or taxable loss, notwithstanding that such expenditures are not deductible for federal income tax purposes;

(c)     any gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of such property, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

(d)     to the extent any Company property has a Book Value that differs from its adjusted tax basis, any items of depreciation, amortization and other cost recovery deductions with respect to such property shall be computed by reference to its Book Value (as adjusted for Book Depreciation) in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(g);

(e)     if the Book Value of any Company property is adjusted as provided in the definition of Book Value, then the amount of such adjustment shall be treated as an item of gain or loss and included in the computation of such taxable income or taxable loss;

(f)     to the extent an adjustment to the adjusted tax basis of Company property pursuant to Code Sections 732(d), 734(b) or 743(b) is required, pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis).

(xxxii)     "Percentage Interest" shall mean a percentage equal to a fraction, the numerator of which is the number of Units held by such Member and the denominator of which is the total number of Units held by Members in each of their respective class of Units.

(xxxiii)     "Person" shall mean any individual or Entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of such "Person" where the context so permits.

(xxxiv)     "RI" shall mean R. Investments, RLLP, a Colorado registered limited liability partnership, in its capacity as a Member of the Company.

(xxxv)     "State Law" means the securities or "blue sky" laws of all applicable states.

(xxxvi)     "Steffens" means Travis William Steffens an individual.

(xxxvii)     "Transfer" means to, directly or indirectly, sell, transfer, assign, pledge, encumber, hypothecate, or similarly dispose of, either voluntarily or involuntarily, by operation of law or otherwise, or to enter into any contract, option or other arrangement or understanding with respect to the sale, transfer, assignment, pledge, encumbrance, hypothecation, or similar

disposition of, any Membership Interests owned by a Person or any interest (including a beneficial interest) in any Membership Interests owned by a Person. "<u>Transfer</u>" when used as a noun shall have a correlative meaning.

(xxxviii)    "<u>Transferee</u>" means any Person that is the recipient of a Membership Interest pursuant to a Transfer made in compliance with Article 9, but that is not admitted as a Member as provided in Section 6.2.

(xxxix)    "<u>Treasury Regulations</u>" ("<u>Treas. Reg</u>.") shall mean the proposed, temporary, and final regulations promulgated under the Code, in effect as of the date of filing the Certificate of Formation, and the corresponding sections of any regulations subsequently issued that amend or supersede such regulations.

(xl)        "<u>Unit</u>" shall mean a unit representing a fractional part of the Membership Interests of the Company.

(xli)        "<u>Unpaid Claim Amount</u>" shall mean, with respect to any Member, an amount equal to (A) such Member's Claim Amount, *reduced by* (B) the aggregate amount of distributions made to such Member pursuant to Section 8.4(a).

**RI-2 NEWCO, LLC**
**LIMITED LIABILITY COMPANY AGREEMENT**

**SCHEDULE A**

**Class A Members and Percentage Interests**

| Member | Class A Units | Percentage Interest |
|---|---|---|
| 1. | | |
| 2. | | |
| 3. | | |

**RI-2 NEWCO, LLC**
**LIMITED LIABILITY COMPANY AGREEMENT**

**<u>SCHEDULE B</u>**

**Class B Members and Percentage Interests**

| <u>Member</u> | <u>Class B Units</u> | <u>Percentage Interest</u> |
|---|---|---|
| 1.   William Travis Steffens | | 95.00% |
| 2.   DS VI, LLC | | 4.00% |
| 3.   Jessica Perrin | | 1.00% |

**RI-2 NEWCO, LLC**
**LIMITED LIABILITY COMPANY AGREEMENT**

**<u>SCHEDULE C</u>**

**Oversight Committee Members**

| **<u>Member</u>** |
|---|
| 1. DS VI, LLC representative |
| 2. Ghassan Timani |
| 3. Shane Kokoszka |
| 4. James M. Hay-Arthur |
| 5. Craig Evans |